## The State of Kansas v. R. S. Osborn.

1. Libel—*Sufficiency of Information—Innuendo*.  In a prosecution for libel, where the defamatory words are actionable *per se*, unambiguous, and point out with certainty to whom they were intended to apply, no explanatory averments are required in the information; but if the words published do not refer with certainty to the person to whom they were intended to apply, or if ambiguous, and derive their defamatory import from extrinsic facts, it is then necessary that such extrinsic facts should be alleged and explanatory averments made.

2. Charge, *Actionable per se, and Libelous*.  An information charged that the defendant knowingly, maliciously, devising and intending to injure, scandalize, vilify and defame one L., to provoke him to wrath, expose him to public ridicule, and deprive him of the benefits of public confidence and social intercourse, did, knowingly, unlawfully and maliciously dictate and compose, and caused to be composed and written, a certain false, scandalous, malicious and defamatory libel of and concerning the said L., which is of the tenor following : "L. and others of their gang are now at the penitentiary and have been for weeks, boarding there, trying to cover up their crookedness, but it can't be covered up.   I will just give you a few facts: L. has for years been supplying Doniphan county with coal from the state penitentiary mines.   This coal was billed to him as slack, at $2 or $3 a car, just enough to pay for loading it, and he in turn sold it to Doniphan county for first-class coal, and supplied all the county institutions with fuel in this manner.   This was first-class coal, but he bought it from the state as slack.   This has been going on for years."   It then continued by an allegation that the malicious and defamatory statement was published in a newspaper, to the scandal and disgrace of L., and contrary to the statute, etc. *Held*, That the charge in the information, without the allegation of

other extrinsic facts or explanatory averments, is actionable *per se,* and libelous.

3. SLANDER, *Dictated, Published, and Adopted by the Defendant.* Where a defendant dictates a slander or furnishes a malicious statement to a reporter of a newspaper for publication, and with the intention and understanding that it will be published, and such reporter afterward commits it to writing and causes it to be published as given to him, the defendant is responsible for libel, although he may not see what is written until after the same is published; and especially is this true in a case where the defendant subsequently indorses the publication as correct and adopts it as his own.

4. INSTRUCTION—*Refusal, Prejudicial Error.* The refusal of an instruction, that "the mere fact of communicating a statement to a person known to be a reporter of a newspaper, unaccompanied with a request to reduce the same to writing or to publish the same, is not sufficient itself to justify the jury in arriving at the conclusion that the defendant either wrote or caused to be written, or published or caused to be published, the article," is *held* to be prejudicial error.

5. DEFECTIVE VERIFICATION—*Waiver.* A defect in the verification of an information is waived by pleading to the merits and going to trial. (*The State v. Otey,* 7 Kas. 69.)

*Appeal from Shawnee District Court.*

AN information was filed in the district court of Shawnee county charging R. S. Osborn with libel, of which the following is a copy:

"In the name and by the authority of the state of Kansas, I, H. C. Safford, county attorney in and for the county of Shawnee, in the state of Kansas, who prosecute for and on behalf of said state, in the district court of said county, sitting in and for the county of Shawnee, come now here and give the court to understand and be informed, that R. S. Osborn, whose Christian name to affiant is unknown, at the county of Shawnee, in the state of Kansas aforesaid, and within the jurisdiction of this court, on the —— day of April, 1893, he, the said R. S. Osborn, whose Christian name to affiant is unknown, then and there knowingly, unlawfully, wickedly and maliciously devising, contriving and intending to injure, scandalize, vilify, prejudice and defame one Cyrus Leland, to provoke him to wrath, to expose him to public hatred and ridicule, and to deprive him of the benefits of public confidence and social intercourse, did then and there unlawfully, knowingly, wickedly and maliciously dictate and

compose, and caused to be composed and written, false, scandalous, malicious, defamatory and libelous matters and things, of and concerning the said Cyrus Leland, which said false, scandalous, malicious, defamatory and libelous matters and things of and concerning the said Cyrus Leland are of the tenor following, that is to say:

"'Lyman U. Humphrey, Bill Higgins, Cy. Leland, and others of their gang, are now at the penitentiary and have been for weeks, boarding there, trying to cover up their crookedness, but it can't be covered up. I will just give you a few facts: Cy. Leland has for years been supplying Doniphan county with coal from the state penitentiary mines. This coal was billed to him as slack, at $2 or $3 a car, just enough to pay for loading it, and he in turn sold it to Doniphan county for first-class coal, and supplied all the county institutions with fuel in this manner. This was first-class coal, but he bought it from the state as slack. This has been going on for years'—which said false, scandalous, malicious and defamatory libel he, the said R. S. Osborn, afterwards, to wit, on the day and year last aforesaid, knowingly, unlawfully and maliciously caused to be printed in a certain paper, to wit, the Topeka *State Journal*, a newspaper printed and published in said county of Shawnee, and of a general circulation therein, and did then and there thereby unlawfully, knowingly and maliciously publish and cause to be published the said libel, to the great scandal, infamy and disgrace of him, the said Cyrus Leland, contrary to the statute in such case made and provided, and against the peace and dignity of the state of Kansas. H. C. SAFFORD,
*County Attorney.*

"STATE OF KANSAS, COUNTY OF SHAWNEE, SS.—Personally appeared before me, S. M. Gardenhire, clerk of the district court of the third judicial district, in and for the county of Shawnee, in the state of Kansas aforesaid, B. M. Curtis, county attorney, who being by me first duly sworn, saith that the several allegations contained in the foregoing information are, according to the best of his knowledge and information and belief, true in substance and in fact. Signed in my presence, and sworn to before me, this 28th day of June, 1893.
S. M. GARDENHIRE, *Clerk.*
"By I. S. CURTIS, *Deputy.*"

The defendant moved to quash the information, upon the grounds of duplicity, and that it did not state facts sufficient

to constitute an offense against the state, or to charge the defendant with the commission of any offense. The motion to quash was overruled, a plea of not guilty entered, and a trial had before a jury, which resulted in a conviction. A motion for a new trial was made and overruled, and the defendant was adjudged to pay a fine of $100 and the costs of prosecution. He appeals.

*James J. Hitt*, and *Noah Allen*, for appellant; *David Overmyer*, and *Frank Doster*, of counsel:

In our opinion, the motion to quash the information should have been sustained, for the following reasons, to wit: First, the information is not verified. What purports to be the verification is no verification whatever. It is not the affidavit of Curtis, for he did not sign it. It is not the affidavit of Safford, for he did not appear before the clerk. This we claim from the face of the record itself, and is what the record shows. We may conjecture what the · real facts were in the case, but we are bound by the record, and we suppose the state is equally bound thereby. The motion to quash raised the sufficiency of the verification the same as any other portion of the information. The law requires all informations to be verified, and unless this is properly done it is as fatal a defect as any other. That objection was not waived in this case by going into a trial without attacking it. The motion to quash raised the sufficiency of this portion of the information at the first opportunity the defendant had.

The information is defective on account of its uncertainty. The defendant is entitled to know the exact charge that is preferred against him. In the words of the statute, "The language of the information must be direct and certain as it regards the party and offense charged." Gen. Stat. of 1889, ¶ 5169. See, also, *The State v. Brooks*, 33 Kas. 713.

There is no colloquium or innuendo in the information. There is no statement to show that Leland was ever a resident of Doniphan county, was ever a dealer in coal there, or, in fact, was ever in that county, or had any dealings of any

kind there. Nor is there a statement that he was a dealer in coal at any place. In criminal cases, all the presumptions are in favor of the defendant and in consonance with his innocence.

Insert the name of Harrison or Cleveland in the article as published and claimed as libelous in the information where the name of Leland occurs, and is there a court in the country that would sustain the information for libel as to such party? We think not. The name of Cyrus Leland, the party alleged to have been libeled, does not appear in the article anywhere. The name Cy. Leland does appear, but they are not the same —are not *idem sonans*. Nor can this court say they are the same in law. There is no innuendo connecting the two. In this connection, and to show the necessity and use of both a colloquium and an innuendo, we refer the court to —

Odger, Lib. & Sl., p. 118, *et seq.*, and authorities there cited. See, also, *Hess v. Sparks*, 44 Kas. 469; *The State v. Mayberry*, 33 id. 441; *The State v. Brooks*, 33 id. 713; *The State v. Henderson*, 1 Rich. 179; *The State v. White*, 6 Ired. 418; *Henicke v. Griffith*, 29 Kas. 516.

The information does not follow the language of the statute (Gen. Stat. of 1889, ¶ 2445), nor does it contain similar words. If held good at all, it must be held good under the third subdivision of the section, viz., "for knowingly and willfully aiding and assisting" in making and publishing. Yet the information, we claim, is fatally defective in omitting the word "willfully" and using instead thereof the words "wickedly and maliciously." Each of these words has a well-defined legal meaning, and in this connection must be construed according to its peculiar and legal meaning. As to the difference between the meaning of the two terms, we refer to 60 Me. 410; 74 Mo. 214. "Willfully" means *intentionally*, not *accidentally*. *The State v. Dowd*, 39 Kas. 412.

There is no better-established legal proposition than that, where one is sought to be punished for libel, the pleader must not only set out *in hæc verba*, but must also profess to set out the exact words of the libel, and any variation between the

allegation of the information and the proof will be fatal. See 38 Ill. App. 613; 6 Rich. 387.

The theory of the trial court—and the only theory upon which a conviction can be maintained in this case—is, that the defendant can be legally held responsible in a criminal action for the willful repetition by another of a slanderous statement. An unbroken chain of authorities holds that, in a civil case for slander, the person first uttering the slanderous words is not held responsible for the damages resulting from the willful repetition of the same by one who heard them originally uttered, whether the name of the original slanderer be given or not. The person repeating the slander or libel is alone responsible for the damages resulting from its voluntary repetition. See 126 Mass. 329; 31 N. E. Rep. 656; 154 Mass. 238; 18 N. H. 115; 16 N. E. Rep. 553.

In the case of *The State v. Clay*, 86 Ill. 147, the court has gone to the fullest extent of the law. In that case Clay made some statements to a reporter derogatory to the character of two ladies. The reporter prepared an article giving the facts as detailed by Clay. Before it was published, the article was submitted to Clay, and he was asked whether it was correct. He replied, "It is pretty rough, but let her go." The court, in that case, very properly held him responsible for the libel. But that is not this case. Osborn never saw the article till after it appeared in the *Journal*. The only act done by Osborn in this case, as claimed by the state, is the one of rehearsing to the reporter a statement, which statement the reporter afterward, of his own volition, put into writing and had published in the *Journal*. It is also claimed that Osborn knew he was talking to a reporter, and that what he said would likely be published. This, we claim, is not aiding or assisting in the publication, nor is it assisting in the making of the libel, within the meaning of those terms as used in the statute. Whom did he assist? See *Cochran v. Butterfield*, 18 N. H. 117. See, also, Town. Sl. & Lib. (3d. ed.), § 117; 16 N. E. Rep. 553; 31 id. 656.

If the language used in the alleged libel was, in the opinion

of the court, libelous *per se*, it was the duty of the court to have so told the jury. If there was a doubt in the mind of the court as to this matter, he should have submitted the question to the jury, under proper instructions. See *The State v. White*, 6 Ired. 418. See, also, *The State v. Henderson*, 1 Rich. 179. That the language, even as used by the reporter on this occasion, is not libelous, see 120 Ind. 43; 38 Ill. App. 613.

We claim that the court erred in not instructing the jury as to privileged communications. The evidence shows that what was said was so said by a public officer concerning another public officer, and was concerning and in connection with the management of public affairs. It is claimed that communications thus made are privileged, and, before a conviction can legally be had, express malice must be proved. Upon this proposition, we refer the court to the following list of authorities: 30 Ill. App. 343; 42 N. W. Rep. 413; 123 Mass. 342; 23 Neb. 828; 81 N. Y. 116; 19 Kas. 417; 26 id. 384; 28 id. 72; 31 id. 465; 44 id. 469.

The court also erred in refusing the instructions asked by the defendant, and in refusing each of said instructions. They properly set forth the law applicable to this case.

*H. C. Safford*, county attorney, for The State:

Counsel cite no case in which a clerical error, such as above, would render the verification a nullity, and the view that we have of such defect, if defect it be, is, that it belongs to that class of defects which can be corrected, on motion, in the court below. See Crim. Code, § 72; *The State v. Adams*, 20 Kas. 311; *The State v. Gould*, 40 id. 258; *The State v. Ruth*, 21 id. 583; *The State v. Otey*, 7 id. 69. The defendant failed to raise the question of the sufficiency of the verification by his motion to quash. He went to trial with the information as it now is, and without objection; and he has therefore waived his right to question the validity of the verification at this time.

Under § 305 of the crimes act, any person who makes or

composes, or dictates or procures the same to be done, or who willfully publishes or circulates, or who willfully aids or assists in making, publishing, or circulating, is guilty of libel. If a person does either or any or all of the things above mentioned, he is guilty of libel. In other words, libel is an offense that may be perpetrated in several different ways, and, therefore, the state has a right in one count to allege that the offense was committed in several different ways. See 1 Bish. Cr. Proc., §§ 434, 436.

As to the failure of the state to name the principal whom Osborn assisted: Under our statutes, as libel is punishable by fine or imprisonment in the county jail, either or both, it is a misdemeanor (§§ 4 and 5, Crim. Code); and "In misdemeanors there are no accessories, but all persons concerned therein, if guilty at all, are principals." *The State v. Gurnee*, 14 Kas. 111.

Again: "Any person who counsels, aids or abets in the commission of an offense may be charged, tried and convicted in the same manner as if he were a principal." Crim. Code, § 115; *The State v. Mosley*, 31 Kas. 355.

By an examination of the alleged libel, it will be seen that the language used is unequivocal, and conveys a direct imputation of dishonesty, and therefore it was not necessary that the information contain a colloquium. See 13 Am. & Eng. Encyc. of Law, and cases cited. No innuendo was needed in this case, for the office of an innuendo is to explain the words spoken and annex to them their proper meaning. See *Henicke v. Griffith*, 29 Kas. 516; *Hess v. Sparks*, 44 id. 468. Under the authority of *The People v. Clay*, 86 Ill. 147, we think the defendant is clearly guilty.

"So, where Cooper told the editor several good stories against the Rev. K., and asked him to show Mr. K. up, and, subsequently, the editor published the substance of them in the newspaper, and Cooper read it and expressed his approval, this was held a publication by Cooper, although the editor knew of the facts from other quarters as well." *Regina v. Cooper*, 15 L. J. Q. B. 205; *Adams v. Kelly*, Ryan & M. 157.

"All concerned in making a libel are alike liable." Town‧ Sl. & Lib., 4th ed., § 115, and foot-notes.

Counsel contend that the court erred in not instructing the jury as to privileged communications. This is a point evolved since the trial in the court below, for on the trial they never for a moment thought that the statement of counsel could be a privileged communication. Defendant never asked any instruction on this point, and there was no such instruction called for by the evidence.

The opinion of the court was delivered by

JOHNSTON, J.: R. S. Osborn was convicted upon the charge of dictating, composing, and causing to be composed, written, and published, a false and malicious libel concerning Cyrus Leland. The sufficiency of the information is challenged, and the first objection made against it is, that the verification is defective. While the information purports to have been made by H. C. Safford and signed by him as county attorney, the jurat recites that B. M. Curtis appeared before the clerk of the court and swore to the truth of the facts stated in the information. This is an obvious clerical error, as it apears that H. C. Safford signed the jurat as well as the information, and the clerk before whom the verification was made certifies that it was signed in his presence and sworn to before him at a stated time. The objection to the verification was not pointed out by the motion to quash, and if it should be regarded as defective, the action of the defendant in pleading to the merits and going to trial would operate as a waiver of the defect. (*The State v. Otey*, 7 Kas. 69; *The State v. Ruth*, 21 id. 583.

5. Defective verification— waiver.

There is nothing substantial in the objection that the information is uncertain as regards either the party or the offense charged. But a more serious objection is the absence of an inducement, a colloquium and innuendo explaining the meaning and application of the language charged to be libelous. It is contended that the words employed do not of themselves

31—54 KAS.

charge Leland with the commission of a specific crime, nor impute to him dishonesty in business, or such other conduct as would make them libelous *per se.* Where the defamatory words falsely charged the commission of an offense involving moral turpitude, or that a person is infected with a contagious disease, or misfeasance or a want of integrity in office, or which impute to him fraud, dishonesty, or misconduct in his busine*s* or profession, they are regarded as actionable *per se ;* and if they are unambiguous, and point out with certainty to whom they are intended to apply, no

1. Libel—sufficiency of information—innuendo.

explanatory averments are required in the charge or information. If, however, the language published does not refer with certainty to the person to whom they were intended to apply, or if it is ambiguous, and derives its defamatory import from extrinsic facts, it then becomes necessary that such extrinsic facts should be alleged. (13 Am. & Eng. Encyc. of Law, 349; Town. Sl. & Lib., §§ 176, 308; *The State v. Henderson,* 1 Rich. Law, 179; *The State v. White,* 6 Ired. 418.) Do the words alleged to have been employed by defendant of themselves appear to apply to Leland, and to affect him injuriously, so as to make them actionable *per se?* It is contended that, taking the language used in its natural meaning, nothing in the publication made imputes actual dishonesty to Leland, nor anything which would reflect on his character, or which would tend to disgrace or degrade him in society. The words alleged to be false and defamatory are:

"Lyman U. Humphrey, Bill Higgins, Cy. Leland and others of their gang are now at the penitentiary and have been for weeks, boarding there, trying to cover up their crookedness, but it can't be covered up. I will just give you a few facts: Cy. Leland has for years been supplying Doniphan county with coal from the state penitentiary mines. This coal was billed to him as slack, at $2 or $3 a car—just enough to pay for loading it; and he in turn sold it to Doniphan county for first-class coal, and supplied all the county institutions with fuel in this manner. This was first-class coal, but he bought it from the state as slack. This has been going on for years."

It is the opinion of the court that this language is actionable *per se,* and libelous. It is urged that as Leland has a right to purchase coal at the penitentiary and supply it to his patrons in Doniphan county, and as he is entitled to get it at as low a rate as he can buy it; and sell it to his customers at such prices as he can procure, no wrong or fraud is imputed to him by the publication; that while he is charged with obtaining first-class coal at the price of slack, there is nothing to show that the price paid operated as a fraud upon anyone, or that the coal which he obtained was worth more than the price alleged to have been paid for it. It is true that he and others are charged to have been boarding at the penitentiary for weeks, trying to cover up their crookedness; but the claim is that, while that charge might imply misconduct and dishonesty, the language following it, used by the defendant, discloses what he meant by the term "crookedness," and, so qualified, does not impute misconduct or dishonesty. We are unable to concur in this view. To us it seems that the obvious and natural meaning of 2. Charge, actionable per se, and libelous. the publication imputes dishonesty against Leland in connection with his business, whereby his character and standing may be injuriously affected. To make the defamatory words actionable *per se,* it is not necessary that they should charge dishonesty and misconduct in express terms. They are to be taken in the sense in which they would naturally be understood by those who heard or read them, and if they consist of a statement of facts which would naturally and presumably be understood by the hearers or readers as a charge of crime, or of fraud or misconduct in business, they are *prima facie* actionable. (13 Am. & Eng. Encyc. of Law, 314, 361, 378.)

Upon its face, the information charges that Leland is, and for years has been, engaged in the business of buying and selling coal, and defendant makes the specific charge against him that he has been crooked, and further, that he has been boarding at the penitentiary for weeks — where he has no right to board — trying to cover up his crookedness. Is

there any doubt about the meaning of this charge? It further charges, that he has obtained from the state penitentiary mines coal billed and sold to him as slack at the nominal price of $2 or $3 a car, "just enough to pay for loading it," and sold the same to the county institutions and other customers as first-class coal. It cannot be overlooked that the mines at the penitentiary are public mines, and that the surplus coal taken therefrom is sold to the highest bidder in the manner prescribed by law; neither can we shut our eyes to the difference between slack and first-class coal. It is common knowledge that slack or coal dust is of little value compared with first-class coal, and the publication in question shows that it is obtained at the mines for the mere cost of loading it. The plain meaning of the charge is, that he had obtained first-class coal from the state at a price far below that at which it should have been sold, and that it was obtained, not honestly, but crookedly, as the prefatory remark of the defendant shows. Can there be any question that this publication would convey to the ordinary mind the idea that Leland had for a number of years been getting from the state the highest grade of coal at the price of the most inferior quality, and that he was at the penitentiary endeavoring to cover up this crookedness, and to conceal the true state of facts from the public? It is to be observed that a different rule applies to words spoken and the same words written and published. Written slander is attended with such deliberation, and is of such a permanent and enduring form, that its publication tends to produce permanent mischief and to provoke breaches of the peace, so that an action therefor can be maintained when it could not be maintained for the same words when merely spoken; and hence it is held, that "words written or printed and published imputing to another any act, the tendency of which is to disgrace him, or to deprive him of the confidence and good will of society, or lessen its esteem for him, are actionable *per se*, and consequently lay the foundation for an indictment under the statute." (*The State v. Smiley*, 37 Ohio St. 30.) We are therefore of opin-

ion that the information charges a libel, and that no error was committed in overruling the motion to quash or the motion in arrest of judgment.

It is next contended that the facts in the case are insufficient to sustain a conviction.    It appears that H. H. Fowler, who was a reporter on the Topeka *State Journal*, and had frequently visited the office of the defendant, who was then secretary of state, in quest of news for publication, went to the office on April 15, 1893, and inquired if he had any news for him.    The defendant replied: "I have something for you this time, but I don't know whether I will tell you or not." He then proceeded to state the defamatory words that were afterward published in the paper, and that were afterward set forth in the information.    The defendant then told Fowler that he could prove all that he had stated and a great deal more, and that he would furnish him a further statement in a few days.    Fowler went immediately to the *State Journal* office and reduced the statement which he had received from the defendant to writing, using the exact language of the defendant, except, possibly, as to one or two unimportant words. The article was published in the *State Journal* of that day, and when the reporter called upon the defendant two days later, he said to him: "Well, Mr. Secretary, I think you have stirred up the animals this time."    In reply, he said: "I will give them some more."    Two other reporters, D. O. McCray and M. Bunnell, called upon the defendant a day or two after the publication in the *State Journal*, when he told them that the publication was substantially as he had given it to Fowler, and that it "was not all he had to offer," and that he "would have some more items to give out to the press." On April 19 he wrote a letter to the *State Journal*, and which was published on the same day, in which he substantially adopts the first publication as his own.    He said:

"As I hoped, I have stirred up the nest of venomous serpents of the republican party in a little interview I had with the *Journal* reporter a day or two ago, and I am gratified and highly amused to find them come back at me with the

answer, 'Liar, liar!' . . . My authority for *my statements* in the *Journal* is the best element within the republican ranks, who claim these things stated to be true," etc.

It is contended that, as the defendant did not specifically request the publication of his statement, and did not see it until it appeared in the paper, and that as he had no connection with the *State Journal,* he cannot be held liable for the libel. While the defendant testified that he did not make the statement for the purpose of publication, or with any idea that it would be published, the evidence of the state fairly tends to show that the statement was made with the expectation and understanding that it would be published. Taking the evidence of the witnesses for the state, it would show that he gave them the statement for publication; that the statement he made was written and published as it was given; and that, after it was so published, he admitted its correctness, and promised that an additional statement would be made in a few days; and that, finally, in a few days afterward, in a written statement to the *State Journal,* he admitted making the statement which was published, and specifically said that it was his own statement. All who are concerned in the making and publication of a libel are alike guilty under the law. If one composes and dictates a false, defamatory statement, knowing that it will be written and published, and it is written and published by another, each is equally liable for the writing, and both may be prosecuted and punished for libel. Our statute provides that

"Every person who makes or composes, dictates, or procures the same to be done, or who willfully publishes or circulates such libels, or in any way knowingly and willfully aids or assists in making, publishing, or circulating the same, shall be punished by imprisonment in the county jail not more than one year, or by a fine not exceeding one thousand dollars." (Gen. Stat. of 1889, ¶ 2445.)

Of course, a person who casually makes a false statement to another, with no purpose or intention that it shall be written, printed, or published, even though the other person be a reporter for a newspaper, and the statement should after-

ward be printed and published, will not be guilty of libel. On the other hand, if a person knowingly dictates a slander to a reporter for publication, and knowing that it would be published, and it is afterward published as given by him, he is responsible for a libel, and may be punished equally with the one who aided or united with him in making the same. (*Queen v. Cooper*, 8 Q. B. 533; *Clay v. The People*, 86 Ill. 147; *Adams v. Kelly*, 1 Ryan & M. 158; *Clifford v. Cochrane*, 10 Ill. App. 577; *Wilson v. Noonan*, 27 Wis. 598; *Miller v. Butler*, 6 Cush. 71; Town. Sl. & Lib., § 115.)

*3. Slander, dictated, published, and adopted by defendant.*

Complaint is made of the charge of the court, but as no exceptions were taken to any of the instructions that were given, the objections urged are not available. That, of course, will not preclude an examination of the instructions requested and refused, where exceptions were taken. The only objection specially urged is, that the court failed to instruct as to privileged communications; but we find that no such instruction was requested, and still further, that there was no testimony to warrant the giving of an instruction on that subject. In the brief for defendant there is the general statement that the court erred in refusing the instructions asked by the defendant which set forth the law applicable to the case, without further specification or comment. One of the instructions requested, but which is not discussed in the brief of appellant, is as follows:

"The mere fact of communicating a statement to a person known to be a reporter of a newspaper, unaccompanied with a request to reduce the same to writing or to publish the same, is not sufficient itself to justify the jury in arriving at the conclusion that the defendant either wrote or caused to be written, or published or caused to be published, the article."

Although the brief makes no special reference to this request, there was an exception to the refusal of the same, and the majority of the court regards that ruling to be erroneous. According to the view of the writer, the law upon this question was fairly expressed in the charge that was given, and, further, that the requested

*4. Instruction—refusal, prejudicial error.*

instruction was not correct or appropriate. In effect, the court told the jury that if defendant made and furnished a false statement to the reporter for publication, and knowing that it would be published as made, and that if the statement so made and published was untrue and not published for justifiable ends, the defendant would be responsible. It is true that a statement made to a reporter without any intent or understanding that it will be written or published cannot be regarded as a libel; but it can hardly be held that one who makes a false and malicious statement of another, with the intent and understanding that it will be published, and which is written and published just as it was dictated, and according to his design, can escape the penalty of the law for the mere reason that no specific request was made to reduce the statement to writing and to publish the same. If the statement is dictated for publication, with the intention that it will be written and published, and the purpose in that respect is carried out, the party who makes it with such intent and understanding is equally as guilty as if an express request for publication had been made. It follows from what has been said that the judgment of the district must be reversed, and the cause remanded for further proceedings.

JOHNSTON, J., dissenting to fourth paragraph of syllabus. ALLEN, J., concurring.

HORTON, C. J.: The defendant, R. S. Osborn, was charged in the information filed against him with having "unlawfully, knowingly, wickedly and maliciously dictated, composed, and caused to be composed and written," the alleged libelous article complained of, and also with having "knowingly, unlawfully and maliciously printed and caused to be published," the alleged libelous article in the Topeka *State Journal*, on April 15, 1893. My first impressions upon the presentation of this case to this court were, that in order to make the article complained of actionable, its language should have been explained by an averment in the way of an innuendo. Where the words of the publication, *prima facie*, are not actionable,

an innuendo is essential; but where a defamatory meaning is apparent on the face of the publication itself, no innuendo is necessary. But, on further examination, I find that the article charged Leland with the commission of acts forbidden by the statute. It is unlawful for any person, other than convicts, to be boarded or fed at the penitentiary. (Laws of 1891, ch. 28, § 5.) Again, the authorities of the penitentiary are only permitted to sell the surplus coal of the mines under their control to the highest responsible bidder. (Laws of 1891, ch. 152, § 42.) They have no authority to give away, nor to sell, first-class coal for the mere cost of loading it. Therefore, as the alleged publication charged Leland with having boarded at the penitentiary for weeks, and also with having sold to Doniphan county for years coal wrongfully obtained by him from the state penitentiary mines at the mere cost of loading it, I concur in the opinion that the article as published was libelous *per se*, and that the motion to quash was properly overruled. (Laws of 1891, ch. 28, § 5; *The State v. Clyne*, 53 Kas. 8.) As observed in the foregoing opinion:

"The obvious and natural meaning of the publication imputes dishonesty against Leland in connection with his business, whereby his character and standing may be injuriously affected. To make the defamatory words actionable *per se*, it is not necessary that they should charge dishonesty and misconduct in express terms." (Crimes Act, § 304.)

To my mind, the serious question presented in this case is, whether the trial court committed error in refusing the instructions prayed for by the defendant, to which our attention was specially called upon the oral argument. Osborn testified in his own defense, among other things, as follows:

"Mr. Fowler came to my office of his own volition. I never made any request to him to publish the article, and in fact had no idea that what I said to him, or the substance thereof even, would be published. I am not, and never was, connected with the *State Journal*, or its publication, and never had any control over its columns. I, in fact, did not wish the matter published then, and think I so informed Mr. Fowler at the time."

The defendant asked the court to instruct the jury as follows:

"1. You are instructed that if you believe from the evidence of this case that the defendant, R. S. Osborn, had no connection with the *State Journal* or its publication, and did not request the editor, proprietor or some one connected with the paper to publish the article set forth in the information, then the defendant should be acquitted.

"2. If you believe from the evidence in this case that H. H. Fowler, who was a reporter for the *State Journal*, of his own volition, went into the office of the defendant, R. S. Osborn, in quest of news, and while there, in a conversation, the defendant, Osborn, communicated the information to Fowler, and that Fowler afterward retired to his office, and there, from memory, reduced to writing the information he so received from Osborn, and handed the same to the editor of the *State Journal* for publication, and if you further believe that Osborn at no time made any request to have the matters published, and never saw what had been written until after the same had been published, then you should bring in a verdict of not guilty.

"3. Before you can convict the defendant in this case, you must believe from the evidence that the defendant either wrote, or caused to be written, the matter set up in the information.

"4. The mere fact of communicating a statement to a person known to be a reporter of a newspaper, unaccompanied with a request to reduce the same to writing or to publish the same, is not sufficient itself to justify the jury in arriving at the conclusion that the defendant either wrote or caused to be written, or published or caused to be published, the article."

The court instructed the jury, among other things, as follows:

"2. Every person who makes or composes, directs or procures the same to be done, or who willfully publishes or circulates such libel, or in any way knowingly and willfully aids or assists in making, publishing, or circulating the same, shall be punished by imprisonment in the county jail not more than one year, or by a fine not exceeding $1,000."

"12. If you find from the evidence in this case, beyond a reasonable doubt, that H. H. Fowler was one of the report-

ers of the *Kansas State Journal*, a newspaper printed and published in Shawnee county, Kansas, and of general circulation therein; that said Fowler was in the habit of calling at the office of defendant as such reporter for the purpose of receiving news for publication, and defendant was advised of that fact; that on April 15, 1893, said reporter called upon said defendant for the purpose of receiving from him news to be published in said paper, and that defendant knew this was the purpose for which said reporter called upon him; that defendant then gave said reporter a statement relating to Cyrus Leland and his connection with the coal mines at the Kansas state penitentiary, which was on said 15th day of April, 1893, published in said paper; that defendant furnished it for publication, or furnished it knowing that said statement would be published in said paper; that said statement was untrue, and was not published for justifiable ends; and that said publication is a 'libel' upon Cyrus Leland, within the definition as given you by the court in instructions heretofore given, then, and in that event, the defendant would be guilty as charged. But unless you do so find beyond a reasonable doubt, then you should acquit the defendant."

The last instruction is the only one in the charge of the court that referred in any way to the evidence introduced upon the trial.

In a criminal action, where the evidence of the state and the defendant is conflicting, the defendant is entitled, upon his request, to have the jury instructed as to the law upon the evidence presented by him. In this case, the only instruction given referring to the evidence was upon that offered by the state. The defendant's testimony not only showed that he never made any request to have his statement to the reporter published, but that he did not wish it to be published, and had no idea it would be published. His testimony cannot be tortured as meaning that he had an intention or understanding that his statement would be published, or that he furnished it to the reporter for publication. This testimony was wholly ignored in the instructions. The court said to the jury, upon the evidence of the state, that if the "defendant furnished his statement for publication, or furnished it knowing his statement would be published in the paper," etc., he

was guilty as charged. In connection with this instruction, the court should have given, upon the evidence of the defendant, the instruction prayed for by him, that

" The mere fact of communicating a statement to a person known to be a reporter of a newspaper, unaccompanied with a request to reduce the same to writing or to publish the same, is not sufficient itself to justify the jury in arriving at the conclusion that the defendant either wrote or caused to be written, or published or caused to be published, the article."

Of course, the jury were to decide upon the credibility of the witnesses. If they believed the witnesses of the state, they should have found, under the law declared by the court, the defendant guilty; on the other hand, if they disbelieved the evidence of the state, and believed only the evidence of the defendant, he was entitled to a verdict of not guilty.

I do not think the authorities cited in the foregoing opinion sustain the court's refusal to give any of the instructions prayed for by the defendant. False, defamatory words, if spoken, constitute a slander; if written and published, a libel. The man who utters a slander may be as bad as the man who publishes it; but the law does not make the one who merely utters a slander punishable for a libel, unless he furnishes, requests, directs or otherwise authorizes the actionable words to be written or published. He must in some way aid or be concerned in the publication of the slander, to be guilty of a libel. In this case, the information does not charge the defendant with aiding or assisting in making, publishing, or circulating the libel. I am not willing to rule that a person, by merely having a conversation with another, who is known to be a reporter of a newspaper, may be punished for a malicious libel, when he never furnished it for publication, never made any request that it should be published, had no wish or intention to have it published, and no understanding or idea that it would be published, although subsequent to the conversation the reporter reduced it to writing in his own office, and then published it in the paper with which he was con-

nected. If such were the law, then silence would, indeed, be golden, in the presence of a newspaper man. But the criminal law concerning libel is more charitable than to hold that, if a verbal defamatory statement is made by one person to a newspaper reporter, such person is criminally liable for its publication, even if published without his consent, intention, request, direction, or authority. To hold that all of the instructions prayed for by the defendant were properly refused, extends criminal libel for verbal defamatory statements further than I think the authorities justify.

As the jury were not sufficiently instructed upon the evidence offered by the defendant, a new trial should be awarded.